
# ARKANSAS COURT OF APPEALS

DIVISION III
No. CV–16–267

| | |
|---|---|
| JERRY D. DUVALL, WANDA DUVALL, R.D. WILLIAMS & COMPANY and XTO ENERGY INC. | **Opinion Delivered** DECEMBER 14, 2016 |
| APPELLANTS | APPEAL FROM THE CONWAY COUNTY CIRCUIT COURT [NO. 15CV-2013-057] |
| V. | |
| VICKI E. CARR-POOL AS TRUSTEE OF THE TRV IRREVOCABLE TRUST | HONORABLE DAVID H. MCCORMICK, JUDGE |
| APPELLEE | AFFIRMED |

## DAVID M. GLOVER, Judge

This is the second time this case is before us on appeal. In the first appeal, our court dismissed for lack of a final order. *Duvall v. Carr-Pool*, 2016 Ark. App. 118. We now have a final order; appellants Jerry and Wanda Duvall (Duvall) have again appealed the Conway County Circuit Court's decision to quiet title to mineral rights (the "mineral rights") in appellee Vicki Carr-Pool, as trustee of the TRV Irrevocable Trust (Carr-Pool), in the following real property (the "real property") in Conway County, Arkansas, to wit:

> The Northeast Quarter of the Northwest Quarter (NE1/4NW1/4) of Section 33, Township 8 North, Range 17 West, except 10 acres in the Southwest corner thereof, conveying 30 acres, more or less.

We affirm the trial court's decision to quiet title to the mineral rights in Carr-Pool, but we do so on a different basis than determined by the trial court.

In April 2013, Carr-Pool filed a petition to quiet title in the mineral rights and for a

declaratory judgment that Duvall owns only the surface rights to the real property. Duvall resisted her petition. Prior to trial, the parties jointly stipulated the following facts concerning the chain of title and curative-title measures:

1. January 25, 1967, Warranty Deed, Mayne Hawkins and Matilda Hawkins conveyed the surface rights to the property at issue to Dr. W.J. Cargile and reserved all oil, gas, and other minerals for Mayne and Matilda Hawkins.

2. July 10, 1970, Warranty Deed, Dr. W.J. Cargile conveyed the surface rights to the property at issue back to Mayne Hawkins, Conway County Circuit Clerk Page 26 of Record Book No. 104.

3. The July 10, 1970, Warranty Deed from Dr. W.J. Cargile to Mayne Hawkins stated that all oil, gas, and other minerals were reserved by Cargile. Cargile never obtained an interest or ownership in the oil, gas, and other minerals as all interests in oil, gas, and other minerals were reserved by Mayne Hawkins and Matilda Hawkins in the Warranty Deed dated January 25, 1967.

4. August 5, 1974, Warranty Deed, Mayne Hawkins and Matilda Hawkins conveyed a Warranty Deed to Duvall involving the property at issue. Rights conveyed by said Deed are at issue in this herein lawsuit. Conway County Circuit Clerk Page 485 of Record Book No. 117.

5. The legal description in the August 5, 1974 Warranty Deed states:

"The Northeast Quarter of the Northwest Quarter (NE1/4NW1/4) of Section 33, Township 8 North, Range 17 West, except 10 acres in the Southwest corner thereof, conveying 30 acres, more or less;

It being understood that all oil, gas, and other minerals in or under or that may be produced from said land have been previously reserved or conveyed."

6. December 12, 1980, Mineral Deed, Mayne Hawkins and Matilda Hawkins, husband and wife, conveyed all of the oil, gas, and other minerals for the property at issue to themselves and Ruby Hawkins as Joint Tenants with the Right of Survivorship, Conway County Circuit Clerk Oil and Gas Record Book 37, Page 642.

7. January 2, 1981, Oil and Gas Lease entered into between Lessors, Mayne Hawkins, Matilda Hawkins and Ruby Hawkins Cargile and Lessee, Munn Exploration Company, Inc. For the property at issue, Conway County Circuit Clerk Book 37,



Page 847.

8. February 11, 1988, Oil and Gas Lease entered into between Lessors, Matilda Hawkins and Ruby Hawkins Cargile and Lessee, Nadel and Gussman for the property at issue, Conway County Circuit Clerk Record Book 70, Page 491.

9. September 21, 1990, Ruby Hawkins heir and the sole remaining Joint Tenant with Right of Survivorship for the property at issue. An Affidavit was filed with the Conway County Circuit Clerk on September 19, 2009, Conway County Circuit Clerk Book 188, Page 0056.

10. November 3, 1994, Oil and Gas Lease entered into between Lessor Ruby Hawkins Cargile and Lessee, Gary A. Monroe for the property at issue, Conway County Circuit Clerk Oil and Gas Record Book 85, Page 666.

11. March 10, 1998, Mineral Deed, Ruby Hawkins Cargile conveyed her minerals interests in the property at issue to herself, Ruby Hawkins Cargile, as Trustee of the Ruby Hawkins Cargile Living Trust dated February 27, 1998, Conway County Circuit Clerk Oil and Gas Record Book 87, Page 349.

12. June 18, 2005, Oil and Gas Lease entered into between Lessor, Ruby Hawkins Cargile, as Trustee for the Ruby Hawkins Cargile Living Trust dated February 27, 1998, and Lessee, Griffith Land Services, Inc. for the property at issue, Conway County Circuit Clerk Oil and Gas Record Book #186, pages 60-65.

13. October 6, 2006, Ruby Hawkins died intestate.

14. January 22, 2007, Mineral Deed, Bettye S. Carr, the successor Trustee of Ruby Hawkins Cargile Living Trust dated February 27, 1998, conveyed and quitclaimed via a Mineral Deed the mineral interests in the property at issue to herself and said Mineral Deed was recorded with the Conway County Court Clerk on January 24, 2007, Conway County Circuit Clerk Oil and Gas Record Book #141, Pages 58-62.

15. February 12, 2007, Mineral Deed, Bettye S. Carr conveyed and quitclaimed via a Mineral Deed the mineral interest in the property at issue to herself, Bettye S. Carr, as Trustee of the Bettye S. Carr Revocable Trust dated the 3rd day of December, 1996, and said Mineral Deed was filed with the Conway County Circuit Clerk on or about February 20, 2007, Conway County Circuit Clerk Oil and Gas Record Book #142, Pages 339-343.

16. October 16, 2009, Warranty Deed, conveyed from Bettye S. Carr, both

individually and as Trustee of the Bettye S. Carr Revocable Trust dated the 3rd day of December, 1996, to Vicki Elizabeth Carr-Pool, as Trustee of the TRV Irrevocable Trust, dated the 14th day of October, 2009, Conway County Circuit Clerk Book 252, Page 0290.

. . . .

25. August 2012, XTO Energy Inc. suspended royalty payments to the TRV Irrevocable Trust for the property at issue based on alleged title defects.

26. XTO Energy Inc. and R.D. Williams and Company entered into an independent contractor agreement with respect to the acquisition by R.D. Williams and Company of oil and gas leases in an area which included the lands which are the subject of this litigation.

At trial, Carr-Pool testified that the only issue to be litigated was who owned the mineral rights; she acknowledged that Duvall owned the surface rights to the real property. She explained that on December 12, 1980, Mayne and Matilda Hawkins conveyed the mineral rights to themselves and Ruby Hawkins as joint tenants with right of survivorship; Mayne died in January 1984; Matilda died in September 1990; Ruby, as sole survivor, conveyed the mineral rights to the Ruby Hawkins Cargile Trust in March 1988; Ruby died intestate in October 2006; and Carr-Pool's mother, Bettye Carr, inherited Ruby's estate. Carr-Pool explained that her mother, as successor trustee of the trust, conveyed the mineral interests to herself in a mineral deed dated January 22, 2007, and then, on February 12, 2007, her mother conveyed the mineral rights by quitclaim deed to the Bettye S. Carr Revocable Trust; then, a warranty deed transferred the mineral rights to the TRV Irrevocable Trust, of which Carr-Pool is the trustee. Carr-Pool stated that since the 1974 deed from the Hawkinses to Duvall, she and her predecessors in title had entered into oil-and-gas leases for the mineral rights in 1981, 1988, 1994, and 2005, and there had never been any objection to

4

any of the leases. Carr–Pool testified she contacted XTO in August 2012 because she knew it had drilled on the real property, and she had not received any royalty payments; she learned there was language in the 1974 deed that was being questioned by XTO, and she needed to obtain a stipulation of interest from Duvall. It was Carr–Pool's testimony that when she called Duvall, he told her he was a greedy person and if he could get the minerals, he would do it. Duvall never signed the stipulation Carr–Pool sent to him.

Sharon Kindy, a petroleum landman who worked for R.D. Williams and Company, testified she was familiar with the real property because XTO sent her a title opinion on the property and asked her to do curative work on any title defects; specifically, she was asked to obtain a stipulation of interest because, according to the title opinion, the deed in Duvall's name stated that all of the minerals had been previously reserved or conveyed, and XTO wanted to know exactly what that meant, how it was being taken, and who was claiming the property. Kindy said she contacted Duvall to see if he was claiming the mineral rights; when she explained why she was calling, he told her he "guessed" he would sign it because the Hawkinses had been good to him and had financed the real property for him when he did not have the money to pay for the real property. Kindy said Duvall did not say he claimed the mineral rights, but he also did not say he didn't claim them. Kindy said after she spoke with Duvall, he informed her he would be filing a quiet-title suit and would not sign a disclaimer of interest.

Jerry Duvall testified that the language "it being understood that all oil, gas, and other minerals in and under or that may be produced from said land have been previously reserved

SLIP OPINION

or conveyed" was in his 1974 deed from the Hawkinses, and he made no objection at that time; he said there was not much he could say when he bought a piece of property that was subject to previous reservations. He stated he did not do a title search until after Sharon Kindy had contacted him, and he saw where Cargile had reserved the mineral rights, but he also said he saw that when Cargile sold the real property back to Mayne Hawkins, he had tied the mineral rights and surface rights back together. Duvall testified he never attempted to lease the mineral rights on the real property because he did not think he owned the mineral rights. He agreed he took no action on the mineral rights from 1974 to 2012. He admitted he knew about the oil-and-gas lease entered into by Ruby Hawkins in 2005 on the real property, but he was not concerned because she was Cargile's widow, and he assumed she had inherited all of Cargile's property. He stated he did not realize the Hawkinses had reserved the mineral rights until 2012.

The trial court issued a letter opinion on February 9, 2015, and then filed an order of judgment on March 16, 2015. In its order, the trial court found that the 1974 warranty deed from Mayne and Matilda Hawkins to Jerry Duvall did not indicate whether Matilda Hawkins held only an inchoate dower interest in the real property and mineral rights or if M. Hawkins and Matilda Hawkins held title as husband and wife as tenants by the entirety; that the 1970 deed from Dr. Cargile to M. Hawkins did not merge the interest held by Matilda Hawkins, and Matilda Hawkins still held her prior mineral-rights reservation and inchoate dower interest in the surface rights to the real property; that the mineral-rights language in the 1974 deed was not a valid mineral-rights reservation; and that there was clear title from M.



Hawkins and Matilda Hawkins to Carr-Pool as trustee, and she is the owner of Matilda Hawkins's interest in the mineral rights. The trial court further found that Duvall had purchased the surface rights to the real property from M. Hawkins and Matilda Hawkins and received a warranty deed containing the mineral-rights-reservation language; that he never attempted to exercise control over the mineral rights for the real property and has not challenged the exercise of control over the mineral rights by Hawkins or subsequent owners since conveyance of the surface rights to the real property to Duvall in 1974; that it was Duvall's testimony he did not think he owned the mineral rights in the real property due to the language in the 1974 deed; that Mayne Hawkins and subsequent owners had openly exercised control over the mineral rights by executing oil-and-gas leases in 1981, 1988, 1994, and 2005, and had accepted payments under these leases; that Duvall testified he was aware of the 2005 lease; and that Duvall never questioned the mineral-rights reservation until 2012. The trial court found that Carr-Pool had established title to the mineral rights by adverse possession and quieted title to the mineral rights in her as trustee of the TRV Irrevocable Trust.

Duvall appeals, arguing that the trial court incorrectly found (1) Carr-Pool had acquired ownership of the mineral rights through adverse possession, and (2) the dower rights of the predecessor in title affected the ownership of the mineral rights.

*Standard of Review*

Quiet-title actions have traditionally been reviewed de novo as equity actions. *SEECO, Inc. v. Holden*, 2015 Ark. App. 555, at 4, 473 S.W.3d 36, 38. Our standard of



review on appeal from a bench trial is not whether there was substantial evidence to support the finding of the circuit court, but whether the circuit court's findings were clearly erroneous or clearly against the preponderance of the evidence. *Mauldin v. Snowden*, 2011 Ark. App. 630, at 2, 386 S.W.3d 560, 562. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a firm conviction that an error has been committed. *Id.* Facts in dispute and determinations of credibility are within the province of the fact-finder. *Id.*

*Adverse Possession*

The trial court determined Carr-Pool was entitled to have the title to the mineral rights vested in her under the theory of adverse possession, a theory never pled by Carr-Pool. The trial court's decision cannot be affirmed based on the theory of adverse possession. Our supreme court has recognized the settled rule that when the mineral-rights ownership has been severed by deed from the surface ownership, adverse possession of the surface is ineffective against the owner of the mineral rights unless the possessor actually invades the minerals by opening mines or drilling wells and continues that action for the necessary period. *Taylor v. Scott*, 285 Ark. 102, 103–04, 685 S.W.2d 160, 161 (1985). Even if the mineral ownership has not been severed by deed from the surface ownership, title to the minerals cannot be acquired by adverse possession unless the minerals are actually invaded by opening mines or drilling wells and continues for the necessary statutory period. *Peterson v. Simpson*, 286 Ark. 177, 182, 690 S.W.2d 720, 724 (1985) (citing *Taylor v. Scott*, 285 Ark. 102, 685 S.W.2d 160 (1985)). Here, while there was evidence of several oil-and-gas leases having been



entered into by Carr-Pool's predecessors, there was no evidence presented that the leases were active mines or wells until XTO suspended royalty payments in 2012, and there was no evidence as to how long royalty payments had been made.

### Validity of Reservation in 1974 Deed

Although the trial court's decision cannot be affirmed on the basis of adverse possession, we still affirm its decision to quiet title to the minerals in Carr-Pool, but on a different basis. We conclude, based on our de novo review, that the language in the 1974 deed from the Hawkinses to Duvall contained a valid reservation of the mineral rights in the Hawkinses, who are Carr-Pool's predecessors.

The basic rule in the construction of deeds, as with other contracts, is to ascertain and give effect to the real intention of the parties, particularly of the grantor, as expressed by the language of the deed, when not contrary to settled principles of law and rules of property. *Barton Land Svsc, Inc. v. SEECO, Inc.*, 2013 Ark. 231, 428 S.W.3d 430; *Gibson v. Pickett*, 256 Ark. 1035, 512 S.W.2d 532 (1974). The intention of the parties must be gathered from the four corners of the instrument itself, if that can be done, and when so done, it will control; the intention of the parties is to be gathered not from some particular clause, but from the whole context of the agreement. *Gibson*, *supra*. Every part of the deed should be harmonized and reconciled so that all may stand together and none be rejected; we will not resort to rules of construction when a deed is clear and contains no ambiguities, but only when the language of the deed is ambiguous, uncertain, or doubtful. *Barton Land Svcs*, *supra*. In Arkansas, we recognize a presumption that a grantor intends to convey his entire interest by his deed, and

such is the effect of a deed which does not limit the interest conveyed; however, a grantor may convey a particular interest, and, when this is done, only that interest is conveyed, and the grantor reserves to himself all he has not conveyed. *Id*.

There are no "magic words" required to reserve mineral rights. Clearly, the language in the 1974 deed evidences the grantors' intentions to reserve the mineral rights, and not convey them to Duvall. Furthermore, Duvall did not think he owned the mineral rights due to the language in the deed, and he never questioned ownership of the mineral rights from 1974 until 2012. He acknowledged he knew of the 2005 oil-and-gas lease, which caused him no concern. It is clear from the language in the 1974 deed that the parties' intentions were to continue the reservation of mineral rights in the Hawkinses.

Although the circuit court found to the contrary on this point, the court ultimately reached the right result in favor of Carr-Pool. We may affirm if the circuit court reaches the correct result, regardless of the reasoning the court employed. *Hawks Enters., Inc. v. Andrews*, 75 Ark. App. 372, 57 S.W.3d 778 (2001). We therefore affirm the court's decision to quiet title to the minerals in Carr-Pool.

Due to our above disposition, the issue of dower is moot. Also, because the parties' intentions were clear to reserve the mineral rights in the 1974 deed, we affirm the trial court's decision to quiet title to the mineral rights in Carr-Pool.

Affirmed.

WHITEAKER and BROWN, JJ., agree.

*Gordon & Caruth, PLC*, by: *Ben Caruth* and *Jeannie L. Denniston*, for appellants.

*Cullen & Co., PLLC*, by: *Tim Cullen*, for appellee.